**UNITED STATES DISTRICT COURT FOR THE
DISTRICT OF NEW HAMPSHIRE**

Elizabeth Juanita Campbell

     v.                                   Civil No. 07-cv-275-JL
                                               Opinion No.: 2008 DNH 027

Hooksett School District, et al.[1]

**REPORT AND RECOMMENDATION**

Before the Court is a complaint (document no. 1), and addenda thereto (document nos. 5, 7-9, 11-23),[2] filed by

---

[1]In addition to the Hooksett School District ("HSD"), Elizabeth Campbell names the following defendants to this action: Hooksett Police Department ("HPD"), Town of Hooksett official David Jodoin, Hooksett Memorial School ("HMS") Principal Carol Soucy, New Hampshire Department of Education ("DOE"), DOE Investigator Joanne Esau, HMS Assistant Principal Stephen Harrises, HPD Prosecutor Kimberly Chabot, HPD Officer Lynda Warhall, HSD Special Education Director Marjorie Polak, DOE Hearings Officer Peter Foley, DOE Special Assistant to the Commissioner Sarah Browning, DOE Commissioner Lionel Tracy, Department of Health and Human Services ("DHHS"), DHHS' Division of Children, Youth, and Families ("DCYF"), DCYF Licensing and Credentialing official Judith Fillion, Jeanne Kincaid, attorney for the HSD, DHHS' Bureau of Elderly and Adult Services officials Michael Fitts and Laura Ripley, Pheasantwood nursing home employees Janet Dedo, Mary McGuire, Debbie Maguire and Roberta White, New Hampshire Board of Nursing official Norman Patenaude, DOE investigator Michael Kelleher, DOE official Mary Heath, DHHS Commissioner Nicholas Toumpas, Attorney Peter Wright, Sun Healthcare, and Drummond, Woodsum & MacMahon.

[2]I will consider the complaint and all the addenda jointly, and referred to hereinafter as the complaint.  In addition, all

Elizabeth Campbell, seeking relief for alleged violations of her state and federal rights by the defendants.

Also before the Court is Campbell's Motion for Summary Judgment and Permanent Injunction (document no. 4), which has been construed as a motion for a temporary restraining order and referred to me for consideration.  This matter is before me for preliminary review to determine, among other things, whether or not the complaint states any claim upon which relief might be granted.  See United States District Court District of New Hampshire Local Rule ("LR") 4.3(d)(1)(B).

I.   Standard of Review

Under this Court's local rules, when a plaintiff commences an action pro se and in forma pauperis, the magistrate judge is directed to conduct a preliminary review.  LR 4.3(d)(1).  In conducting the preliminary review, the Court construes pro se pleadings liberally, however inartfully pleaded.  See Erickson v. Pardus, ___ U.S. ___, 127 S. Ct. 2197, 2200 (2007) (following Estelle v. Gamble, 429 U.S. 97, 106 (1976) and Haines v. Kerner, 404 U.S. 519, 520-21 (1972) to construe pro se pleadings

---

of the documents attached to Campbell's narrative pleadings will be considered to be part of the pleadings.  See Fed. R. Civ. P. 10(c) (requiring that written instruments attached to a pleading be construed as part of the pleading "for all purposes").

liberally in favor of the pro se party). "The policy behind affording pro se plaintiffs liberal interpretation is that if they present sufficient facts, the court may intuit the correct cause of action, even if it was imperfectly pled." See Castro v. United States, 540 U.S. 375, 381 (2003) (noting that courts may construe pro se pleadings so as to avoid inappropriately stringent rules and unnecessary dismissals of claims); Ahmed v. Rosenblatt, 118 F.3d 886, 890 (1st Cir. 1997). All of the factual assertions made by a pro se plaintiff and inferences reasonably drawn therefrom must be accepted as true. See id. This review ensures that pro se pleadings are given fair and meaningful consideration.

The purpose of this preliminary review is to discern the true nature of the claims presented. If the claims set forth are frivolous, a court may dismiss the complaint. Neitzke v. Williams, 490 U.S. 319, 327–28 (1989) (frivolous claims include "claims of infringement of a legal interest which clearly does not exist" and "claims describing fantastic or delusional scenarios"); see also Purvis v. Ponte 929 F.2d 822, 826 (1st Cir. 1991) (permitting sua sponte dismissal where complaint is facially frivolous and plaintiff is given notice and an

opportunity to amend his complaint prior to dismissal); 28 U.S.C.
§ 1915(d).  A judge reviewing a complaint filed by an individual
proceeding in forma pauperis has "not only the authority to
dismiss a claim based on an indisputably meritless legal theory,
but also the unusual power to pierce the veil of the complaint's
factual allegations and dismiss those claims whose factual
contentions are clearly baseless."  Neitzke, 490 U.S. at 327.
With this standard in mind, I find the facts as follows.

II.  Background[3]

Elizabeth Campbell lives in Hooksett, New Hampshire, with
her minor son, J.P.E.H.  Although, at the time of filing,

---

[3]In a separate action filed in this Court, Campbell v.
Hooksett Sch. Dist., Civ. No. 07-276-SM, plaintiff asserts claims
relating to the provision of her son's special education.  On
December 18, 2007, I issued an Order directing service of some of
the claims therein and a Report and Recommendation discussing all
of the claims raised and recommending that certain claims be
dismissed and plaintiff's motion for a preliminary injunction be
denied.  My Report and Recommendation was approved on January 14,
2008.  Plaintiff has filed motions in both cases to consolidate
these matters.  While some of the facts and allegations overlap
in the two cases, I will presume that the claims that were
addressed in my December 18, 2007 Report and Recommendation are
not repeated in this action.  Accordingly, to the extent that a
generous construction of Campbell's complaint might allow me to
find that this case raises some claims identical to those in
Campbell's other case, I will not so construe the claims set
forth.  Any allegations relating to claims that were addressed in
my December 18, 2007 Report and Recommendation will not be
addressed here.  The factual findings made in my December 18,
2007 Report and Recommendation are explicitly incorporated here.

J.P.E.H. was enrolled in private school, the allegations contained in the complaint stem from J.P.E.H.'s attendance at the Hooksett Memorial School ("HMS").  During the several years J.P.E.H. attended HMS, Campbell was embroiled in disagreement with HSD and HMS employees as to how to assess and address J.P.E.H.'s educational needs.  The matters were not resolved amicably, and while the chronology of events is not entirely clear from the filings, it appears that, ultimately, J.P.E.H. was deemed not to be in need of special education services.  Campbell appealed this finding to the New Hampshire Department of Education ("DOE"), but, ultimately, the DOE hearing officer, Peter Foley, upheld the decision.  Campbell subsequently enrolled her child in private school.  She now asserts a number of claims based on or stemming from her dispute with the HSD about J.P.E.H.'s special education needs that were not addressed in my December 18, 2007 Report and Recommendation.  Below are the facts relevant to the specific claim alleged.

A.   **Improper Ban from School Grounds – October 19, 2006**

While Campbell's administrative complaint regarding J.P.E.H.'s special education needs was pending before the DOE, a state investigator in the matter, Joanne Esau, asked Campbell why

she hadn't requested that the school include a specific item in her son's individualized education plan.  Campbell responded that she had been asking for exactly that for three years, and in fact the failure of the school district to include the item in the plan was the basis of the complaint Esau was investigating. Campbell asked, rhetorically, "What do you want me to do? Do you want me to go to the school and put a gun to their heads and make them do it?"  Campbell alleges that Esau reported this incident to HMS Principal Carol Soucy, who notified the School Resource Officer, a Hooksett police officer stationed in the public schools, Lynda Warhall.  Soucy also expressed to Warhall her concern about "Campbell's behavior for quite some time," including frequent and disruptive phone calls, visits, and emails that were often aggressive or hostile, and included criticisms of individual school employees, the school's provision of special education to her son, public schools in general, and liberal politics.  School employees generally felt unsafe around Campbell, because they found her to be unreasonable and unpredictable.  Campbell admits that on a number of occasions, she sent emails to the school that were critical of the school's provision of educational services to her child, public schools in

general, and liberal politics.  Campbell claims that her communication was offensive to the defendants to this action because she is a Republican, and because she is African-American. She also believes defendants disfavor those attributes, particularly, in combination.

On October 19, 2006, the day Warhall received the complaint from Soucy, Warhall met Campbell outside of the school when she came to pick up J.P.E.H. and told her that she could not enter the building, or call, fax, or email anyone at the school, until she attended a meeting with Warhall and Soucy regarding appropriate methods of communication between Campbell and school officials.  Warhall offered to meet that day, the next day, or during the following week.  Campbell claims that during this conversation, Warhall got physically close to her, yelled at her, and spit in her face.  Warhall allowed Campbell to go get her son from the school, but Campbell states that she was scared and embarrassed by the incident and tried to leave.  Campbell claims that Warhall intimidated her by blocking her path when she was trying to get back into her car.  According to Warhall's written report of the incident, it was Campbell who became angry, defensive, and paranoid during the interaction, accusing Warhall

of only being at the school to monitor Campbell's behavior because Campbell is African-American, and calling Warhall a liar when she tried to explain her role at the school.  Warhall reported that she ultimately walked away from Campbell in order to end the conversation.

Campbell and Warhall agree that Warhall predicated Campbell's ability to enter the building on Campbell's willingness to meet with her and Soucy, that Campbell refused to meet at that time, and that she refused to set up a meeting at a later date.  At the time this action was filed, Campbell had still not been given permission to return to the HMS building, as she had still refused to meet with Warhall and Soucy, despite additional invitations to meet extended by both Warhall and Soucy.

B.   **Police Harassment – April 6, 2007 and November 26, 2007**

Campbell asserts that on April 6, 2007, Warhall called her house shortly before noon.  Campbell let the call go to her answering machine, and Warhall left a message stating that she wanted to meet with Campbell and Soucy.  Campbell erased the message and did not call to schedule a meeting.  Forty minutes later, according to Campbell, Warhall showed up at her door with

8

another police officer.  When Campbell refused to answer the door, the officers accused her, in voices loud enough to be heard by the neighbors, of abusing and neglecting her son, and threatened to notify DCYF or to take action against her in court. Campbell did not open the door, and no further action was taken against her by the police.

On November 26, 2007, the police came to Campbell's house again to check on J.P.E.H.'s well-being because they had received a report that J.P.E.H. missed school for several days.  Campbell states that J.P.E.H. had not missed any school.  Campbell claims the police appearance at her house was intended solely to harass her.

C.   **Conspiracy to Deprive Campbell of Employment**

Campbell claims that the attorney representing the HSD, Jeanne Kincaid, is spearheading a conspiracy to deprive her of employment, so that she will be unable to earn money, which will cause her to lose her house and require her to remove her son from private school and return him to the Hooksett schools. Campbell further contends the reason for this conspiracy is to enable Kincaid and other HSD officials to again have the ability to abuse both her and her son.  In support of her assertion of

conspiracy, Campbell claims that Kincaid once worked for the State of New Hampshire, and that she is using contacts within the State to communicate with Campbell's employers and potential employers, including Janet Dedo, who is in charge of Campbell's employment at the Pheasantwood Nursing Home ("Pheasantwood"). Campbell asserts that as a result of Kincaid's machinations (which Campbell also characterizes as "a gang rape"), Dedo falsely accused Campbell of abusing an elderly patient in her care at Pheasantwood in March of 2007, and that she was terminated from that job as a result.

Pheasantwood filed a complaint against Campbell with the New Hampshire Board of Nursing.  The complaint asserted that Campbell had refused to let a resident out of bed to use the bathroom, and had placed her hands on the resident to keep her in bed.  The complaint alleges that Campbell was so defensive that she was unable to have a rational conversation about the incident. Campbell disputes all of those assertions.

The complaint against Campbell was determined to be "founded" by the New Hampshire Bureau of Elderly and Adult Services.  Campbell was given the opportunity to appeal the finding by filing a response before January 30, 2008.  Campbell

asserts that despite the "founded" determination, her name has never been placed on a list that she claims exists to identify all of those nurses who have been found to have abused patients. Instead, Campbell claims, she has been repeatedly cleared to work by employers since the complaint was filed. Campbell believes that this discrepancy is due to the fact that the creators and supporters of the false allegation and finding of abuse against her, in conspiracy with one another, have tried to make it difficult for her to be hired, but that the conspirators lack either the authority or the courage to actually complete the task and have her name placed falsely on the list of nurses found guilty of patient abuse.

As further evidence of the conspiracy to prevent her from being employable, Campbell has filed several printouts of her email inbox, which show the senders and subject lines of "spam" emails that she has received. Campbell claims these emails were sent to her by Foley, Kincaid, and Peter Wright, her bankruptcy attorney, and an alleged acquaintance of Foley and Kincaid, working in conjunction with one another to harass her. Campbell believes these individuals have generated the "spam" because they know she is in need of money, in need of work and in need of

health insurance.  Campbell also states that she has received
pornographic spam from Foley.

D.   **Retaliation for Exercise of First Amendment Rights**

Since 2003, when J.P.E.H. was first enrolled in the Hooksett
schools, Campbell has expressed her beliefs about education, race
relations, and society repeatedly in emails to various Hooksett
school officials.  Campbell states that her views are unpopular
with those individuals because she is politically conservative
and that the school officials, as liberals, disagree with her
positions.  Campbell claims that all of the bad treatment she has
received from the defendants over the last several years,
including the allegations that have given rise to the actions
pending before this Court, is the result of the defendants'
efforts to retaliate against her for the expression of her views,
and to silence her.  Further, Campbell states, the actions of
defendants were designed to retaliate against her for her
challenges to the special education services in the Hooksett
schools.  Campbell claims that her right to free speech, to
petition the government for a redress of grievances, and to not
be discriminated against on the basis of her race or political
affiliation, have been violated by this retaliatory activity.

12

III. <u>Discussion</u>

    A.   **Section 1983**

Section 1983 creates a cause of action against those who, acting under color of state law, violate federal constitutional or statutory law.  <u>See</u> 42 U.S.C. § 1983[4]; <u>City of Okla. City v. Tuttle</u>, 471 U.S. 808, 829 (1985); <u>Wilson v. Town of Mendon</u>, 294 F.3d 1, 6 (1st Cir. 2002).  In order for a defendant to be held liable under § 1983, his or her conduct must have caused the alleged constitutional or statutory deprivation.  <u>See</u> <u>Monell v. Dep't of Soc. Servs.</u>, 436 U.S. 658, 692 (1978); <u>Soto v. Flores</u>, 103 F.3d 1056, 1061–62 (1st Cir. 1997).  Here, Campbell claims that defendants are acting under color of state law, and that they violated her federal constitutional rights.  Campbell's claims arise, therefore, under § 1983 and are analyzed, seriatum, below.

------

[4]42 U.S.C. § 1983 provides that:

> Every person who under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory or the District of Columbia, subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law . . . .

     1.   <u>Improper Ban from School Property Claim</u>

"Every citizen lawfully present in a public place has a right to engage in peaceable and orderly expression that is not incompatible with the primary activity of the place in question. . . [The] crucial question is whether the manner of expression is basically incompatible with the normal activity of a particular place at a particular time." <u>United States v. Grace</u>, 461 U.S. 171, 184–85 (1983) (Marshall, J., concurring in part and dissenting in part).  A school is a public place; one in which persons entitled to be there may, under the protection of the First Amendment, express themselves as long as the time, place, or type of expression does not materially disrupt the rights of other people who also have a right to be at the school.  <u>Tinker v. Des Moines Indep. Cmty. Sch. Dist.</u>, 393 U.S. 503, 513 (1969); <u>cf.</u> <u>Morse v. Frederick</u>, ___ U.S. ___, 127 S.Ct. 2618, 2627 (2007) (criticizing <u>Tinker</u> and narrowing its holding in the context of vulgar but nondisruptive student speech that might be permissibly limited in school setting).

Based on all of the allegations before the Court, I cannot find that Campbell was denied access to HMS.  On the very day that her contact with the school was limited by Warhall to

14

letters and notes, Campbell was offered the opportunity to meet
to address the communication issues that had caused Warhall to
limit contact in the first place.  From the time the "ban" was in
place, therefore, Campbell herself held the key to regaining
access to school property and officials.  Further, Warhall's
actions were in response to a perceived threat of gun violence,
and to the frequency and hostility with which Campbell was
communicating with school officials.  While Campbell may not
agree that her actions should have been perceived as threatening
or disruptive, it is clear that they were reasonably understood
to be so by the school officials, and by Warhall.  Warhall did
not attempt to silence Campbell's expression, but simply sought a
means by which to facilitate the expression that would not cause
consternation or fear on the part of school officials.
Accordingly, I find that Campbell has failed to state a claim for
denial of access to a public place, and I recommend that the
claim be dismissed.

        2.    The Police Harassment Claim

    In claiming that her rights were violated by the police
harassing her in April 2007 and November 2007, as well as during
her encounter with Warhall in October 2006, it appears that

Campbell is attempting to assert a substantive due process claim under the Fourteenth Amendment.  A claim of a violation of substantive due process rights can be brought on the basis of a deprivation of a specifically identified property or liberty interest, or by an allegation that the state's conduct "shocks the conscience."  Cruz-Erazo v. Rivera-Montanez, 212 F.3d 617, 622 (1st Cir. 2000) (citing Brown v. Hot, Sexy & Safer Prods., 68 F.3d 525, 531 (1st Cir. 1995) (internal citations omitted).  Because Campbell has not identified a particular constitutionally protected interest of which she was deprived by the police actions alleged here, her substantive due process claim relies on her proffering sufficient minimum facts to allow me to find that the police conduct alleged is conscience-shocking.  See Cruz-Erazo, 212 F.3d at 622 (in the absence of plaintiff specifically articulating an abridged property interest, Court is not obligated to articulate the claim on her behalf, but may focus its inquiry on whether the behavior alleged "shocks the conscience.").

Most of the cases in this Circuit that find state action egregious enough to be considered "conscience-shocking" involve highly physically intrusive acts.  See Hot, Sexy & Safer Prods.,

68 F.3d at 531 (citing cases).  There remains, however, "the possibility that verbal or other less physical harassment . . . might rise to a conscience-shocking level." Cruz-Erazo, 212 F.3d at 522; see Hot, Sexy & Safer Prods., 68 F.3d at 531.  Even allowing for the possibility that verbal threats, or intimidation without harm, might shock the conscience in an extreme case, given the precedent in this Circuit, I cannot find, even if I credit Campbell's version of events as true, that she has alleged sufficient facts to show that this case is so offensive and egregious as to shock the conscience of a reasonable person.  See e.g., Cruz-Erazo, 212 F.3d at 622-23 (finding that months of harassment by police officers which included threats of physical violence, insults, the filing of unjustified charges, and pushing plaintiff's pregnant daughter who suffered a miscarriage two days later, did not rise to the level of shocking the conscience); Pittsley v. Warish, 927 F.2d 3, 7 (1st Cir. 1991) (concluding police conduct "despicable and wrongful" but not unconstitutional where police officers repeatedly threatened to kill plaintiff and once threatened plaintiff's children with never seeing their father again); Phelps v. Bracy, Civ. Action No. 06-40090-GAO, 2007 WL 2872458, *3 (D. Mass. Sept. 27, 2007) (Allegations that a

corrections officer threatened, yelled at, swore at, physically intimidated, and appeared to intend imminent harm to a civilly committed person insufficient to allege a constitutional violation).  While if, in fact, Warhall got physically close to Campbell, yelled at her, spit in her face, and momentarily blocked access to her car, that behavior could be considered unprofessional, it is not severe enough to amount to a constitutional violation.  The same is true of the allegation that officers knocked on Campbell's door for 22 minutes and said, in a loud voice, that they would be contacting DCYF about her son, or that they were checking on J.P.E.H.'s well-being. Accordingly, as Campbell has failed to allege claims that might arguably reach the standard of "conscience-shocking" to merit judicial relief, I recommend that this claim be dismissed.

> 3.   The Conspiracy to Deprive Plaintiff of Employment Claim

Campbell alleges that defendants, in their capacity as state actors, engaged in a conspiracy to deprive her of employment or the potential to be employed, by attempting to deprive her of her nursing license.  A conspiracy to commit a civil rights violation is actionable under 42 U.S.C. § 1985(3), which states in relevant part:

> If two or more persons in any State or Territory
> conspire . . . for the purpose of depriving, either
> directly or indirectly, any person or class of persons
> of the equal protection of the laws, or of equal
> privileges and immunities under the laws; or for the
> purpose of preventing or hindering the constituted
> authorities of any State or Territory from giving or
> securing to all persons within such State or Territory
> the equal protection of the laws; . . . in any case of
> conspiracy set forth in this section, if one or more
> persons engaged therein do, or cause to be done, any
> act in furtherance of the object of such conspiracy,
> whereby another is injured in his person or property, or
> deprived of having and exercising any right or
> privilege of a citizen of the United States, the party
> so injured or deprived may have an action for the
> recovery of damages occasioned by such injury or
> deprivation, against any one or more of the
> conspirators.

To state a claim under § 1985(3), the plaintiff must allege that

the conspiratorial conduct complained of was motivated by some

"racial, or perhaps otherwise class-based, invidiously

discriminatory animus.'"  Aulson v. Blanchard, 83 F.3d 1, 3 (1st

Cir. 1996) (quoting Griffin v. Breckenridge, 403 U.S. 88, 91

(1971)).  "[T]he plaintiff must plead conspiracy in some detail

and provide some factual basis supporting the existence of a

conspiracy."  Slagel v. Shell Oil Refinery, 811 F. Supp. 378, 381

(C.D. Ill. 1993).  "Mere conjecture that there has been a

conspiracy is not enough to state a claim."  Tarkowski v. Robert

Bartlett Realty Co., 644 F.2d 1204, 1208 (7th Cir. 1980).

19

Campbell broadly alleges that the defendants have conspired against her, driven by race–based animus, to deprive her of her employment, her means of income, her nursing license, her home, and the ability to care for her son.  Campbell has failed, however, to offer any specific facts that actually support the conclusion that any of the defendants engaged in a conspiracy to so violate her rights.  Campbell's claims are speculative and conclusory, unsubstantiated with any specific or concrete facts that could perhaps be indulgently construed in her favor. Campbell's assertions that the spam email proves a conspiracy exists simply defies common sense.  See Neitzke, 490 U.S. at 327 (court has "power to pierce the veil of the complaint's factual allegations and dismiss those claims whose factual contentions are clearly baseless.").

    4.    The First Amendment/Retaliation Claim

Campbell's last claim is that the mistreatment she received was the defendants' response to her expression of her political views and a reaction to administrative complaints she filed against the HSD.  Campbell alleges that the defendants' actions, therefore, violate the First Amendment's guarantees of free

20

expression and the right to petition the government for a redress of grievances.

In order to recover under § 1983 for a violation of First Amendment rights, a plaintiff must allege that the defendant intended to inhibit speech protected by the First Amendment, Tatro v. Kervin, 41 F.3d 9, 18 (1st Cir. 1994), and that her "speech was in fact chilled or intimidated." Sullivan v. Carrick, 888 F.2d 1, 4 (1st Cir. 1989).  Campbell alleges that her First Amendment rights were abridged by the denial of unrestricted access to the school, the reactionary refusal of school officials to provide her son with special education, and the actions of Warhall and other state and municipal employees that were designed to punish her for her criticism of the defendants.

I cannot find here that Campbell's allegations give rise to a cause of action against the defendants for a willful suppression of Campbell's constitutionally protected speech.  As explained above, Campbell was never asked to stop expressing herself, and was not denied access to the school, as she suggests.  Campbell has not alleged sufficient facts to

demonstrate that the defendants actually intended to deny her the ability to express herself.

Campbell points to one occasion where the HSD attorney attempted to negotiate a settlement with Campbell's lawyer in the special education matter that, if accepted by Campbell, would have included Campbell's withdrawal of one of her administrative complaints.  Campbell did not accept those terms, however, and was not hindered in proceeding to a full due process hearing and attempting to win at the hearing what she could not obtain by agreement with the HSD.

Campbell also demonstrated that, when she filed a complaint with the DOE regarding alleged mistreatment of her son, the DOE investigator did not interview her prior to the resolution of the complaint.  There is no indication, however, that she was denied the ability to file the complaint, or that the complaint was not considered.

I have addressed Campbell's assertions about denial of access to J.P.E.H.'s school and found that she was not, in fact, denied access as a result of the content of her speech, but simply was required to express herself in a peaceable and reasonable manner consistent with the normal functioning of the

school itself.  Likewise, Campbell was not inhibited from fighting an accusation of patient abuse.

Campbell's assertion that all of the acts taken against her were motivated by the defendants' dislike of the content of Campbell's speech have simply not been demonstrated by specific and credible factual allegations.  Accordingly, I recommend that this claim also be dismissed.

B.  **Campbell's Motion for a Temporary Restraining Order**

Campbell has filed a motion seeking emergency injunctive relief, asking the Court to, among other things, prevent defendants from interfering with her employment.  A motion for a preliminary injunctive redress cannot be granted unless the movant demonstrates that she is likely to succeed on the merits of the underlying claims in the action.  See Weaver v. Henderson, 984 F.2d 11, 12 (1st Cir. 1993) (citing cases for the proposition that the "sine qua non" of the . . . inquiry is likelihood of success on the merits of the underlying claims and labelling this factor "critical.").  Because I find that Campbell has failed to state any claim in this action upon which relief might be granted, and that the action should, therefore, be dismissed, I necessarily find that she is not able to demonstrate that she is

likely to succeed on the merits of the claims.  Accordingly, I recommend that the motion for a temporary restraining order be denied as moot upon the approval of this Report and Recommendation.

Conclusion

For the foregoing reasons, I recommend that the complaint in this matter be dismissed (document nos. 1, 5, 7-9 & 11-23) and the motion for a temporary restraining order be denied (document no. 4).  Any objections to this report and recommendation must be filed within ten (10) days of receipt of this notice.  Failure to file objections within the specified time waives the right to appeal the district court's order.  See Unauthorized Practice of Law Comm. v. Gordon, 979 F.2d 11, 13-14 (1st Cir. 1992); United States v. Valencia-Copete, 792 F.2d 4, 6 (1st Cir. 1986).

James R. Muirhead
United States Magistrate Judge

Date:      January 31, 2008

cc:        Elizabeth Juanita Campbell, pro se